# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL CASE NO. 3:22-cv-00114-MR

NAFIS AKEEM-ALIM )
ABDULLAH-MALIK,[1] )
            )
        Plaintiff, )
            )    <u>**MEMORANDUM OF**</u>
vs. )    <u>**DECISION AND ORDER**</u>
            )
EDDIE CATHEY, et al., )
            )
        Defendants. )
_____ )

**THIS MATTER** is before the Court a Motion for Summary Judgment filed by Defendants Ashley Grooms, Tim Hodgson, Cody Kiker, Pam Hypes, Kelly Martin, Jonathan Philemon, Bradley Purser, Dan Rogers, Dana Rucker, and F. Speer [Doc. 64].[2] Also pending is the Plaintiff's "Emergency Notice" that was docketed as a Motion to Stay. [Doc. 95].

_____

[1] According to the North Carolina Department of Adult Corrections' ("NCDAC") website, the Plaintiff's name is Nafis A. Malik. <u>See</u> https://webapps.doc.state.nc.us/opi/viewoffend er.do?method=view&offenderID=0574723&searchOffenderId=0574723&searchDOBRa nge=0&listurl=pagelistoffendersearchresults&listpage=1 (last accessed Aug. 27, 2024); Fed. R. Evid. 201.

[2] Identified as "Grooms," "Hodgens" "Kiker," "Pam," "K. Martin," "Philmore," "Pursor," "D. Rogers," "Rucker," and "Speer," respectively, in the Amended Complaint. [Doc. 18 at 1, 5-6]. Defendant Grooms was formerly known as Ashley Fultz. The Clerk will be instructed to correct the Defendants' names in the Court's record.

## I.    BACKGROUND

The incarcerated Plaintiff Nafis Malik, proceeding pro se, is presently incarcerated in NCDAC.  He filed this civil rights action addressing incidents that allegedly occurred while he was a pretrial detainee at the Union County Jail ("UCJ").  [Doc. 1: Compl.].  The unverified Amended Complaint passed initial review against Defendants Martin, Hodges, Grooms, Purser, and Kiker for the use of excessive force and sexual contact, and the Court exercised supplemental jurisdiction over the Plaintiff's related North Carolina assault and battery claims.  The Amended Complaint also passed initial review against Defendants Speer, Rucker, Purser, Grooms, Philemon, and Rogers for imposing unconstitutional conditions of confinement; against Defendants Hype and Speer for deliberate indifference to a serious medical need; and against Defendants Rogers and Grooms for retaliation.  [Doc. 18: Am. Compl.; Doc. 20: Order on Initial Rev.].

The Defendants filed a Motion for Summary Judgment.  [Doc. 64: MSJ].  Thereafter, the Court entered an Order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising the Plaintiff of the requirements for responding to the summary judgment motion and of the

_____

manner in which evidence could be submitted to the Court. [Doc. 80: Roseboro Order]. The Plaintiff responded and filed supporting materials opposing summary judgment.[3] [See, e.g., Doc. 71: MSJ Resp.; Doc. 72: Medical Records; Doc. 86: Verified MSJ Resp.]. The Defendants have replied. [Doc. 73: MSJ Reply; see Doc. 91: Notice]. These matters are therefore ripe for disposition.

On August 22, 2024, the Plaintiff filed an "Emergency Notice" in which he requests that the Court stay this action. [Doc. 95].

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

_____

[3] The Court has considered the relevant portions of the record including the Plaintiff's verified filings.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to

the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

<u>Scott</u>, 550 U.S. at 380.

## III.   FACTUAL BACKGROUND

The relevant forecast of evidence, viewed in the light most favorable to the Plaintiff, shows the following.[4]

On July 29, 2020, the Plaintiff was admitted to the UCJ as a pretrial detainee.  [Doc. 64-4: Greenlee Aff. at ¶ 17; See Doc. 65-2: MSJ Ex. at 1-3 (Booking Report)].   He had received right hip surgery approximately six weeks earlier and cervical spine surgery approximately five months prior to that.  [Doc. 84-3: Plaintiff's Decl. at 1; Doc. 64-4: Greenlee Aff. at ¶ 18]. The Plaintiff's medical records and screening indicated that he needed a walker, and he was allowed to use one.[5]  [Doc. 64-4: Greenlee Aff. at ¶ 19]. The medical records further showed that a wheelchair was "authorized, but not mandated."  [Doc. 64-4: Greenlee Aff. at ¶ 32; see Doc. 85: Plaintiff's Med. Ex. at 20-21 (Jan. 28, 2021 Dr. Homesley letter stating that Plaintiff should be given the use of a wheelchair due to left hip arthritis)].  The Plaintiff was encouraged to use a walker instead of a wheelchair in order to better rehabilitate from surgery.  [Doc. 64-4: Greenlee Aff. at ¶ 19].

_____

[4] The Court will not attempt to exhaustively address the voluminous materials, including medical records, that the parties have filed. The Court highlights the relevant forecast of evidence and the factual discrepancies between the parties' accounts of the incidents.

[5] The Plaintiff has made inconsistent statements that: he needed a wheelchair, a walker, and a cane [Doc. 84-3: Plaintiff's Decl. at 1]; that he was "unable to walk without a walker and wheelchair" [Doc. 84-2: Plaintiff's Decl. at ¶ 14]; and that he was "barely" able to walk without a wheelchair or walker [Doc. 70: Ex. R-1 at 12:00].

Walkers and wheelchairs are not permitted in general housing areas of the UCJ, so the Plaintiff was housed in a single-occupancy medical cell. [Doc. 64-4: Greenlee Aff. at ¶ 20; Doc. 64-8: Philemon Aff. at ¶¶ 4-5]. There was some concern about the Plaintiff's ability to turn his wheelchair safely inside the cell; however, one was provided at the Plaintiff's insistence after it was authorized by a provider. [Doc. 64-4: Greenlee Aff. at ¶ 32].

The Plaintiff was authorized by medical to have two mattresses, which he was given. [See Doc. 64-10: Purser Aff. at ¶ 9; Doc. 85: Plaintiff's Med. Ex. at 20-21].

During August 2020, the Plaintiff received 11 prescriptions to treat a variety of complaints, including three increasing prescriptions for gabapentin to treat pain. [Doc. 64-4: Greenlee Aff. at ¶ 21]. During September 2020, the Plaintiff received an additional six prescriptions, and all of his medications were given to him. [Id. at ¶ 21-25]. Once, Nurse Speer threw medicine in Plaintiff's hand through the food slot and, on another occasion, Nurse Hypes deliberately dropped the Plaintiff's medicine through the trap slot.[6] [Doc. 84-2 at 83-92: Plaintiff's Decl. at ¶¶ 18- 19].

---

[6] The Defendants deny this and note occasions where the Plaintiff deliberately dropped his medication or refused to follow instructions. [Doc. 62-4: Greenlee Aff. at ¶¶ 26-27].

On September 17, 2020, the Plaintiff did not have access to a wheelchair; he fell in his cell during a meal pass while using a walker to retrieve a food tray. [Doc. 84-3: Plaintiff's Decl. at 2; Doc. 64-10: Purser Aff. at ¶ 7; see Doc. 65-6: MSJ Ex. at 1-3 (Incident Report 2020-1064)]. Nurse Hypes yelled at the Plaintiff to get up, or he would be sent to a remote temporary holding cell (THC) for "discipline and punishment." [Doc. 84-2 at 45-56: Plaintiff's Decl. at ¶ 12]. Hypes noted in the Plaintiff's chart that the Plaintiff's bed "is very high [due to] having 2 mattress." [Doc. 70: Ex. U at 36]. Medical provider Adona Struve believed that the extra height on Plaintiff's bed contributed to the fall, so she revoked the second mattress and ordered its removal "for patient[] safety." [Doc. 64-4: Greenlee Aff. at ¶ 31; Doc. 64-10: Purser Aff. at ¶ 10; see Doc. 70: Ex. U at 22].

On September 18, 2020, Officers Kiker and Wade entered the Plaintiff's cell to remove his second mattress. [Doc. 62-6: Kiker Aff. at ¶ 8; Doc. 64-4: Greenlee Aff. at ¶ 31]. The Plaintiff verbally and physically resisted the officers. [Doc. 64-10: Purser Aff. at ¶ 12]. Kiker and Wade lifted the Plaintiff and removed one of the mattresses. [Doc. 62-6: Kiker Aff. at ¶ 8]. This was Kiker's only involvement with the Plaintiff's claims. [Id.]. Defendant Grooms had nothing to do with the mattress removal. [Doc. 64-2: Fultz Aff. at ¶ 25].

8

The Plaintiff received inmate discipline as a result of resisting the mattress removal. [Doc. 64-10: Purser Aff. at ¶ 12; Doc. 65-7: MSJ Ex. at 1-3]. When an inmate is serving a period of disciplinary segregation, he is required to wear a red jumpsuit instead of the usual orange. [Doc. 64-10: Purser Aff. at ¶ 13]. Sergeant Rucker went to the Plaintiff's cell with a red jumpsuit due to the Plaintiff's earlier rule violations. [Doc. 64-12: Rucker Aff. at ¶ 14; Doc. 65-8: MSJ Ex. at 1-4]. The Plaintiff slid onto the floor when Rucker entered his cell, saying that he could not change his jumpsuit because he fell. [Doc. 64-12: Rucker Aff. at ¶¶ 15-16]. Nurse Dozier responded to the cell and determined that the Plaintiff needed to be moved to a THC without a bed frame because he had fallen twice in less than 24 hours. [Id. at ¶ 17; Doc. 70: Ex. U at 35; see Doc. 64-2: Fultz Aff. at ¶ 25]. Officers Rucker, Purser, and Black, carried the Plaintiff to the THC.[7] [Doc. 64-12: Rucker Aff. at ¶ 18].

At the THC, Sergeant Rucker and Officer Purser forcibly changed the Plaintiff's jumpsuit. [Doc. 64-12: Rucker Aff. at ¶ 19]. While removing the orange jumpsuit, the Plaintiff's boxers came partway down his thighs and

_____
[7] Video footage conclusively shows that Kiker was not involved in this. [Doc. 70: Exs. G-1, G-2].

Rucker touched the Plaintiff's penis.[8] [Id. at ¶ 22; Doc. 64-9: Price[9] Aff. at ¶¶ 7-8]. Defendant Grooms was present.[10] [Doc. 71-3: Plaintiff's Aff. at 4].

The THC where the Plaintiff was taken had no toilet, running water, bed or bedframe, window or natural light; it had poor ventilation; there was a blackout cover on the cell door; and there were no privacy curtains on the shower, no outside recreation, and an "inadequate" law library. [Doc. 71-3: Plaintiff's Aff. at 3-4; Doc. 84-2 at 5-13: Plaintiff's Decl. at ¶ 3; Doc. 84-2 at 23-27: Plaintiff's Decl. at ¶ 8; Doc. 84-2 at 45-56: Plaintiff's Decl. at ¶ 14; Doc. 84-2 at 62-73: Plaintiff's Decl. at ¶ 11; Doc. 84-3: Plaintiff's Decl. at 3]. The Plaintiff was in 23-1 detention in the THC, meaning that he had one hour outside the cell to shower and use the kiosk and phone. [Doc. 84-2 at 5-13: Plaintiff's Decl. at ¶ 3; Doc. 84-2 at 37-42: Plaintiff's Decl. at ¶¶ 6-7; Doc. 71-3: Plaintiff's Aff. at 5]. At no time was the Plaintiff deprived of time out of his

---

[8] Defendant Rucker denies touching Plaintiff's penis. [Doc. 64-12: Rucker Aff. at ¶ 21].

[9] Lieutenant Matthew Price interviewed the Plaintiff on October 1, 2020 as part of his criminal investigation into the Plaintiff's sexual assault allegation. [See Doc. 64-9: Price Affid.; Doc. 70: Ex. R-1].

[10] Defendant Grooms denies involvement in this incident. [Doc. 64-2: Fultz Aff. at ¶ 25].

cell, access to the kiosk system,[11] exercise, showers, or nutritious food service. [Doc. 64-8: Philemon Aff. at ¶ 6].

On September 30, 2020, the Plaintiff reported to a state court judge that he was sexually assaulted on September 18, 2020; this led UCJ to initiate an investigation by jail staff and by criminal detectives.[12] [Doc. 84-4: Plaintiff's Ex. at 12 (Sept. 30, 2020 Order by Judge Williams directing UCSO to meet with Plaintiff within 48 hours); Doc. 84-2 at 45-56: Plaintiff's Decl. at ¶ 15; Doc. 64-1: Dennis Aff. at ¶ 28]. UCSO Lieutenant Matthew Price conducted a videotaped interview of the Plaintiff about his sexual assault allegations. [See Doc. 70: Ex. R-1]. The Plaintiff explained that his boxers were pulled down to mid-thigh as staff forcibly removed his jumpsuit, that Rucker's hand came into contact with the Plaintiff's penis and buttocks during that process, but that the contact was not sexual in nature. [Doc. 64-9: Price Aff. at ¶¶ 6-8].

On December 11, 2020, the Plaintiff returned to UCJ from a court date in Rowan County. [Doc. 84-2 at 72-82: Plaintiff's Decl. at ¶ 5]. He arrived

---

[11] The Plaintiff's contention that he had "no access to Kiosk" is inconsistent with the Plaintiff's other assertions and is conclusively refuted by the record of his electronic submissions. [Doc. 84-2 at 45-56: Plaintiff's Decl. at ¶ 29; see, e.g., Doc. 65-17: MSJ Ex. at 13].

[12] The Defendants deny that the Plaintiff raised any allegations specifically against Defendant Purser. [Doc. 64-1: Dennis Aff. at ¶ 28].

with a bag of legal materials that a Rowan County transport officer had searched and "clear[ed]." [Doc. 84-2 at 72-82: Plaintiff's Decl. at ¶ 5]. The Plaintiff, sitting in a wheelchair, retrieved his bag of legal documents from a shelf and placed it on his lap; he requested a supervisor. [Doc. 84-2 at 72-82: Plaintiff's Decl. at ¶ 5]. Defendant Grooms told the Plaintiff that the materials needed to be searched and reached for the bag of documents on the Plaintiff's lap. [Doc. 64-2: Fultz Aff. at ¶ 7]. The Plaintiff grabbed the bag, physically resisted,[13] and tried to rise out of his wheelchair. [Doc. 64-2: Fultz Aff. at ¶¶ 9, 11; Doc. 64-7: Martin Aff. at ¶ 11]. Staff responded, including Defendants Martin, Hodgson, and Rogers. [Doc. 84-2 at 14-22: Plaintiff's Decl. at ¶ 8; Doc. 84-3: Plaintiff's Decl. at 3]. The Plaintiff continued resisting, and he attempted to assault staff by kicking them. [Doc. 64-2: Fultz Aff. at ¶ 14]. Defendant Martin drew her taser and warned that Plaintiff that if he did not submit his effects for inspection and stop resisting, she would tase him to obtain compliance.[14] [Doc. 64-17: Martin Aff. at ¶ 12]. The Plaintiff

---

[13] The Plaintiff's description of this incident, including that he was not resisting, is conclusively contradicted by the video evidence. [Doc. 84-2 at 14-22: Plaintiff's Decl. at ¶ 11; see Doc. 70: Exs. C-1, C-2].

[14] The Plaintiff states that Martin: placed him in an "illegal choke hold" [Doc. 71-4: Plaintiff's Decl. at ¶ 9]; "George Floyd choke[d]" him [Doc. 71-3: Plaintiff's Decl. at 2, 4]; and used a "fist thrust" to his throat [Doc. 84-2 at 5-13: Plaintiff's Decl. at ¶ 3]. The Court need not accept these inconsistent contentions. Moreover, the video conclusively demonstrates that Martin never placed him in a chokehold or had him on the floor.

continued resisting and kicking, so Martin administered a two-second drive stun to the Plaintiff's leg to stop his kicking. [Doc. 64-2: Fultz Aff. at ¶ 14; Doc. 62-5: Hodgson Aff. at ¶ 14; Martin Aff. at ¶ 14]. The Plaintiff's legs were then shackled to the wheelchair, his hands were cuffed behind the wheelchair, and he was taken to his cell where he received medical attention. [Doc. 64-7: Martin Aff. at ¶ 16]. Officers found contraband in the Plaintiff's materials, i.e., a pen and staples.[15] [Doc. 84-2 at 14-22: Plaintiff's Decl. at ¶ 13]. Grooms had no interaction with the Plaintiff between December 11 and 14, 2020. [Doc. 64-2: Fultz Aff. at ¶ 22].

On December 14, 2020, Defendants Hodgson and Martin went to the Plaintiff's cell: Hodgson to deliver mail and Martin to conduct a disciplinary hearing. [Doc. 62-5: Hodgson Aff. at ¶ 23]. The Plaintiff was using the kiosk system in the hallway outside of his cell at that time. [Id. at ¶ 24]. Hodgson directed the Plaintiff to return to his cell to receive his mail and a disciplinary hearing. [Id. at ¶ 25]. The Plaintiff initially complied but then he turned back, stating that his kiosk time was about to expire. [Id. at ¶ 26]. Hodgson again directed the Plaintiff to his cell but the Plaintiff refused and attempted to push past Hodgson, using his walker. [Id. at ¶ 27]. Hodgson again directed the

---

[15] The Plaintiff admits having a pen and staples, but he denies that they were contraband. [Doc. 84-2 at 14-22: Plaintiff's Decl. at ¶ 13].

Plaintiff to enter his room, and the Plaintiff again refused. [Id. at ¶¶ 28-29]. Hodgson placed his hand on the Plaintiff's chest and directed him into the cell.[16] [Id. at ¶ 30]. The Plaintiff then tripped and fell. [Id. at ¶ 30]. Hodgson attempted to assist the Plaintiff onto the bed but the Plaintiff refused his assistance and continued to fight him.[17] [Id. at ¶ 31]. Hodgson snatched the Plaintiff roughly from the floor, placed him on the bed, and restrained him in a seated position by placing his hands on the Plaintiff's shoulders. [Id. at ¶ 32; Doc. 71-3: Plaintiff's Decl. at 5]. Martin attempted to proceed with the disciplinary hearing but the Plaintiff was cursing and screaming, so she and Hodgson left. [Doc. 62-5: Hodgson Affid. at ¶ 33]. Medical staff subsequently came to the Plaintiff's cell to clean a 2cm x 2cm abrasion on his left forearm that had "minimal bleeding." [Doc: 70: Ex. U at 25]. Neosporin and a Band-aid were applied. [Id.].

The Plaintiff filed 344 pages of grievances during the five months at UCJ. [Doc. 64-1: Dennis Aff. at ¶¶ 24-25; Doc. 73-1: Dennis Supp. Aff. at ¶

---

[16] The Plaintiff now contends that Defendant Hodgson did not touch his chest, but rather, "judo chopped" his neck. [Doc. 71-4: Plaintiff's Decl. at ¶ 12]. This inconsistent allegation was not included in the Amended Complaint.

[17] The Plaintiff's contention that Hodgson yelled obscenities at him is refuted by the audiotape; the Plaintiff's contention that the Defendants "blurred out" their voices from the recording is rejected. [Doc. 84-2 at 62-73: Plaintiff's Decl. at ¶¶ 13, 18; see Doc. 70: Ex. D-3].

10-11]. Fifty-three pages of this were medical grievances that included medical and mental health requests, all of which received a response. [Doc. 64-1: Dennis Aff. at ¶ 26; <u>see</u> Doc. 65-17; Doc. 65-17: Ex. P; Doc. 70: Ex. U at 125].

The Plaintiff filed grievances addressing the conditions of his confinement on August 15 and 16; September 14; November 14, 15, 17 and 23; and December 1, 2, and 7, 2020. [<u>See</u> Doc. 73-2: Ex. X]. The Plaintiff filed one grievance addressing Defendant Grooms on December 11, 2020, which states:

> I AM FILLING A OFFICIAL COMPLAINT TO MOVE FOR CITATIONS WARRANT AGAINST OFFICER A. GROOMS PHYSICAL ASSULT TO A US VETERAN MENTAL HEALTH PATIENT, DISTRUCTION OF PROPERTY, THEFT BY DECEPTION, LYING UNDER OATH TO LAW ENFORCEMENT AND ABUSE OF DISCRETION AND POWER.

[Doc. 65-18: Ex. Q at 1; <u>see</u> Doc. 64-1: Dennis Aff. at ¶ 27] (errors uncorrected). Defendant Rucker denied the grievance as meritless on December 12, 2020, and Lieutenant Dennis denied the Plaintiff's appeal on December 18, 2020. [<u>Id.</u>]. Defendant Grooms never discussed the Plaintiff outside of official reports, and she never discussed any punishment or retaliation against the Plaintiff with any other UCSO personnel including Defendant Rogers. [Doc. 64-2: Fultz Aff. at ¶¶ 23-24; Doc. 64-11: Rogers Aff. at ¶¶ 9-10]. Defendant Rogers never ordered Grooms or any other

subordinate to retaliate against the Plaintiff for any reason. [Doc. 64-11: Rogers Aff. at ¶¶ 9-10]. Neither Rogers, Grooms, nor any other of Rogers' subordinates including Martin retaliated against the Plaintiff for any reason. [Id.; Doc. 64-2: Fultz Aff. at ¶¶ 22-24; Doc. 64-1: Dennis Aff. at ¶ 27; Doc. 64-7: Martin Aff. at ¶ 41].

The Plaintiff received inmate discipline on multiple occasions at UCJ due to his "routine violation of inmate rules, but each time, he received due process before discipline was imposed." [Doc. 64-11: Rogers Aff. at ¶ 8]. His discipline included:

9/18/20: Disrupting service, disobeying direct order, verbally abusing staff; Plaintiff waived a disciplinary hearing and received 80 days in segregation;

10/1/20: Failure to report to sick call; a hearing was conducted and Plaintiff was found responsible and received 20 days of concurrent segregation;

10/27/20: Theft of jail property, disobeying direct order, verbally abusing staff; a hearing was conducted and Plaintiff was found responsible and received 70 days of segregation;

11/27/20: Interfering with lockdown, disobeying direct order, communicating threats; a hearing was attempted on 12/14/20 but Plaintiff became irate and refused to participate and he received 130 days in segregation; and

11/27/20: Accumulation of hazardous items; failure to pass inspection; failure to turn in items; attaching items to walls; storing or misuse of cleaning supplies; failure

16

to surrender contraband; possession of contraband; possession of illicit drugs; damage to jail property; Plaintiff refused to participate in the 12/14/20 and he received 230 days in segregation.

[Doc. 64-7: Martin Aff. at ¶ 44(a)-(e)]. All of the Plaintiff's disciplinary proceedings were conducted in accordance with UCJ policy. [Id. at ¶ 46; see Doc. 66-4: Ex. V; Doc. 66-5: Ex. W]. The Plaintiff did not serve the full sentences of disciplinary segregation because he was released to Mecklenburg County on December 19, 2020. [Doc. 64-7: Martin Aff. at ¶ 45; Doc. 84-2 at 5-13: Plaintiff's Decl. at ¶ 3].

The Defendants have filed audio and video footage of various incidents. The recordings show that the following transpired on December 11, 2020:[18]

| | |
|---|---|
| 0:00 | Plaintiff is frisked then sits in his wheelchair. |
| 1:09 | Plaintiff pushes himself to a wall and pulls a large clear plastic bag, with items inside off of a shelf and onto his lap. |
| 1:44 | Officer Grooms enters the area. |
| 2:04 | Plaintiff and Grooms converse. |
| 2:37 | Plaintiff removes his feet from the wheelchair footrests and places them on the floor; he gestures at Grooms. |

_____

[18] Exhibits C-1 and C-2 depict the same incidents from different angles. Portions of the events are blocked by officers' bodies. The times on the videos are not synchronized.

| 2:39 | Grooms reaches for the bag in Plaintiff's lap; Plaintiff grabs the bag and a struggle ensues; officers in the area approach and assist. |
| --- | --- |
| 2:49 | Additional officers begin to arrive. |
| 3:11 | Grooms pulls away with the bag and its partial contents; multiple officers surround Plaintiff in his wheelchair. |
| 3:13 | Plaintiff begins kicking his legs. |
| 3:30 | Officer Martin leans towards Plaintiff with one arm extended. |
| 7:10 | Plaintiff is wheeled away, with his legs shackled and his hands cuffed behind him. |

[Doc. 70: Ex. C-1].

| 1:29 | Plaintiff kicks his legs. |
| --- | --- |
| 1:35 | Plaintiff flails his arms as a male officer behind him tries to restrain them. |
| 1:42 | Officer Martin stands in front of Plaintiff with one arm extended towards him. |
| 1:51 | Plaintiff's wheelchair is tipped back; Martin has a hand on Plaintiff's raised leg, speaking to him. |
| 3:29 | Plaintiff is talking and moving around as officers restrain his hands behind his back. |

[Doc. 70: Ex. C-2].

The recordings show that the following transpired on December 14, 2020:[19]

| | |
|---|---|
| 00:10 | Officer Hodgson approaches Plaintiff, who is standing with his walker at a hallway kiosk opposite his closed cell door, and they converse; Martin waits in the hallway. |
| 00:18 | Hodgson opens Plaintiff's cell door. |
| 00:33 | Plaintiff turns his walker and passes Hodgson, into the cell. |
| 00:43 | Hodgson follows Plaintiff, holding a tablet and papers. |
| 00:56 | Plaintiff has turned back around and his arm gestures past Hodgson, towards the kiosk. |
| 1:19 | Plaintiff, with his walker, steps beside Hodgson towards to kiosk. |
| 1:29 | Hodgson pushes Plaintiff towards his cell door; Plaintiff's walker remains in the hallway; Hodgson and a female officer follow; Martin remains in the hallway. |
| 1:54 | Martin approaches the cell doorway. |
| 2:21 | Martin returns to the hallway. |
| 2:27 | The other female officer leaves Plaintiff's cell. |
| 2:30 | Hodgson leaves Plaintiff's cell and closes the cell door. |

_____

[19] Exhibits D-1 and D-2 depict a hallway leading to Plaintiff's cell from the far ends of the hallway, separated by a door. The videos have been combined for ease of reference. Some events are blocked by doors and the officers' bodies. Exhibit D-3 is an audio recording of the incident; its time is not synchronized with the videos.

19

[Doc. 70: Ex. D-1, D-2].   Audio recording from that incident reflects the following:

| | |
|---|---|
| 00:02 | Plaintiff refers to the kiosk, says "come on, man," and that it's going to be cut off and "you can't restart it;" Hodgson responds. |
| 00:17 | Plaintiff continues talking and says loudly, "the fuck you doing, man." |
| 00:19 | Hodgson says "go in your room." |
| 00:25 | Plaintiff continues cursing loudly, says "I want my time out," and refers to being in "lockdown." |
| 00:34 | Plaintiff says "it won't restart," and "you can't restart it." |
| 00:37 | Plaintiff shouts "what, what"; then clattering is heard. |
| 00:43 | Plaintiff says "get the fuck off me, man." |
| 00:46 | Hodgson orders Plaintiff to "get over there," and to "sit down" repeatedly as Plaintiff continues arguing. |
| 00:58 | Hodgson loudly orders Plaintiff to "sit down." |
| 1:04 | Hodgson orders Plaintiff to "stop" repeatedly. |
| 1:07 | Plaintiff says "stop assaulting me, officer." |
| 1:14 | Plaintiff continues cursing and referring to the kiosk. |
| 1:17 | Hodgson says "sit down," and Plaintiff says "get off me." |
| 1:21 | Martin says "chill out so I can do your hearing."   Plaintiff calls her "bitch," curses at her, and says that she choked and tased him for no reason. |
| 1:29 | Martin asks if Plaintiff is refusing to have his hearing. |

20

1:35           Plaintiff continues yelling over Martin's voice, curses, and says something about the hearing.

1:36           Martin says "nope, you're done."

[Doc. 70: Ex. D-3].

October 1, 2020 video footage with audio from an interview room

at UCSO reflects the following:

8:22           Plaintiff, handcuffed and in a wheelchair, is brought into an interview room, converses with two staff officers.

10:50         Plaintiff refers to the fact he is a veteran, his medical conditions, and his desire for fresh air and more time out of his cell.

14:40         Plaintiff says that the jumpsuit he was brought was too small.

16:15         Plaintiff denies that he ever fell off of the bed, that he fell because of the walker.

19:55         After a break where Plaintiff was alone in the interview room, Price enters and introduces himself.

21:12         Plaintiff describes how he was taken to a "detox tank" by a nurse and sergeant Rucker.

33:20         Rucker had brought the wrong size jumpsuit.

33:37         Purser and Rucker started taking off Plaintiff's jumpsuit; others were observing.

34:15         Plaintiff's underwear came down to around mid-thigh; Plaintiff had to pull his underwear back up.

21

| 35:40 | Plaintiff denies that the officers reached out and held his penis; he is "not accusing the man of that." |
|---|---|
| 36:24 | Plaintiff says that Rucker did not go back towards Plaintiff once his underwear were down. |
| 36:45 | Plaintiff just wants Rucker to recognize that Plaintiff is a citizen and that he has rights. |
| 38:38 | Plaintiff says that Rucker applied excessive force by touching his "junk" with a woman standing there. |
| 41:10 | Plaintiff just wants officers to "act right" and treat him right. |
| 45:17 | The original two officers reenter and converse with Plaintiff. |
| 49:45 | Plaintiff is wheeled out of the interview room. |

[Doc. 70: Ex. R-1].

## IV.    DISCUSSION

### A.    Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a § 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. 534 U.S.

516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524). Because exhaustion of administrative remedies is an affirmative defense, defendants have the burden of pleading and proving lack of exhaustion. Id. at 216.

The Defendants contend that the Plaintiff failed to exhaust his administrative remedies with regard to the sexual battery claim against Defendant Purser. However, the Plaintiff has forecast evidence that he exhausted this claim. [Doc. 84-2 at 45-56: Plaintiff's Decl. at ¶ 29]. The Defendants have failed to carry their burden to demonstrate lack of exhaustion, and summary judgment will be denied on this ground. See Jones, 549 U.S. at 216.

### B.    Excessive Force & Sexual Contact

"Due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to the convicted prisoner." Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992) (citations omitted). The Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). To prevail on an excessive force claim, a pretrial detainee must show only that the force "purposely or knowingly used against

him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389 (2015). The standard for assessing a pretrial detainee's excessive force claim is "solely an objective one." Id. In determining whether the force was objectively unreasonable, a court considers the evidence "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing Graham, 490 U.S. at 396). "Included within this protection is a pre-trial detainee's liberty interest to be free from unwanted sexual contact by prison officials." Rush v. Bryant, 2021 WL 1608345, at *3 (S.D.W. Va. Feb. 22, 2021); see Young v. Muncy, 2020 WL 1521799, at *4 (S.D.W. Va. March 30, 2020) ("Sexual assault is not a legitimate part of a prisoner's punishment, particularly ... where Plaintiff is a pretrial detainee....").

The forecast of evidence demonstrates that, on September 18, 2020, the Plaintiff's boxers were unintentionally pulled down partially during the jumpsuit change; that any contact with Plaintiff's privates was incidental; and that Defendant Grooms saw this inadvertent incident. The Plaintiff's contention that he was intimidated into changing his story in the UCSO interview room is conclusively contradicted by the interview video and is rejected. See Scott, 550 U.S. at 380. The Defendants will, therefore, be granted summary judgment on this claim.

The forecast of evidence shows that, on December 11, 2020, the Plaintiff resisted officers when they attempted to search his papers when he returned from court. He cursed at staff, grabbed a bag of papers that officers were trying to search, attempted to rise from his wheelchair, attempted to kick officers, and resisted with his arms; that he continued resisting after being warned that a taser would be used if he did not stop; and that Martin administered a short drive stun when the Plaintiff continued trying to kick staff. The forecast of evidence demonstrates that officers attempted to resolve the matter verbally and only resorted to force when the Plaintiff became physically resistant, and that the incident ended as soon as the Plaintiff was secured in handcuffs and shackles. See, e.g., Kingsley, 576 U.S. at 397 (listing considerations that may bear on the reasonableness of the force, including the extent of plaintiff's injury, efforts by the officers to temper the amount of force used, and whether the plaintiff was actively resisting). There is no genuine dispute for trial on this incident and summary judgment will be granted for the Defendants.

The forecast of evidence shows that, on December 14, 2020, the Plaintiff verbally and physically refused to comply with Defendant Hodgson's orders to return to his cell. Hodgson pushed the Plaintiff and he fell, sustaining a small abrasion on his arm. The Plaintiff was then held on his

bed in a seated position. The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact that Hodgson's actions were objectively unreasonable in light of the Plaintiff's recorded verbal and physical resistance. See, e.g., Kingsley, 576 U.S. at 397. Accordingly, the Defendants will be granted summary judgment on this claim.

As to Defendant Kiker, the forecast of evidence shows that he was not involved in the December 11 and 14, 2020 incidents, and that his only involvement with the incidents underlying the Plaintiff's claims was when he helped remove Plaintiff's second mattress on September 18, 2020. The Plaintiff's vague assertions that Kiker "consistently" antagonized and assaulted him, and that he pushed, verbally assaulted, and threatened the Plaintiff on an unspecified date fail to demonstrate the existence of a genuine dispute regarding the claims before the Court. [Doc. 84-2 at 1-4: Plaintiff's Decl. at ¶ 6; Doc. 84-2 at 45-56: Plaintiff's Decl. at ¶ 16]. Accordingly, summary judgment will be granted for Defendant Kiker.

In sum, the Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact with regard to his claims of sexual contact and excessive force. Accordingly, the Defendants' Motion for Summary Judgment on these claims will be granted.

**C.    Deliberate Indifference to a Serious Medical Need**

A pretrial detainee's claim based on deliberate indifference to a serious medical need is properly brought pursuant to the Fourteenth Amendment. Short v. Hartman, 87 F.4th 593, 611 (4th Cir. 2023).  To prevail on such a claim, a plaintiff must demonstrate that:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had the condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

Id. at 611. Under this standard, "the plaintiff [need not] show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." Id.  "[I]t is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)).  It is insufficient, however, for the plaintiff to show that "the defendant negligently or accidentally failed to do right by the detainee."  Id. at 611-12.

The forecast of evidence demonstrates that the Plaintiff received a great deal of medication and treatment while he resided at UCJ, including

medical and mental health inquiries that received responses. As to the Plaintiff's second mattress, the forecast of evidence demonstrates that it was a medical provider, and not Nurse Hypes, who revoked the same. Plaintiff's disagreement with that decision does not rise to the level of deliberate indifference. The forecast of evidence also demonstrates that the Plaintiff was provided walking assistance including a walker and a wheelchair in accordance with the provider's orders. Although the Plaintiff may have preferred a wheelchair at certain times, he has failed to forecast any evidence of deliberate indifference in this regard. The forecast of evidence also demonstrates that the Plaintiff was consistently provided medication during his time at UCJ. He has forecast evidence that Nurse Speer threw medicine in the Plaintiff's hand through the food slot once, and that Nurse Hypes deliberately dropped the Plaintiff's medicine through the trap slot once. Accepting this as true, there is no genuine dispute as to the Defendants' deliberate indifference because there is no forecast of evidence that these two isolated incidents posed an unjustifiably high risk of harm, or that the Plaintiff was harmed as a result. See generally Morgan v. Buncombe Cnty., No. 1:16-cv-286-FDW, 2016 WL 4585900, at *2 (W.D.N.C. Sept. 1, 2016) ("It is well settled that rudeness and unprofessionalism by prison staff do not constitute a federal or constitutional violation under Section 1983.").

Accordingly, the Defendants will be granted summary judgment on the Plaintiff's claims of deliberate indifference to a serious medical need.

### D.    Conditions of Confinement

To prevail on a Fourteenth Amendment claim based on unconstitutional conditions of confinement, a pretrial detainee must prove that the action taken was not "'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'" Short v. Hartman, 87 F.4th 593, 611 (4th Cir. 2023) (quoting Kingsley v. Hendrickson, 576 U.S. 389, 399 (2015)).  In other words, a pretrial detainee must only show that "the defendant's action or inaction was … objectively unreasonable" in that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  [Id.] (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)).

The forecast of evidence demonstrates that it was Nurse Dozier who ordered the Plaintiff's transfer to the THC without a bed frame for his safety, that Defendants Rucker and Purser carried out this medical directive, and that Defendant Grooms had nothing to do with that incident.  The forecast of evidence further demonstrates that the THC cell had no toilet, running water, bed or bedframe, window or natural light; no outside recreation; poor

ventilation; an "inadequate" law library;[20] and no privacy curtains on the shower. The forecast of evidence further shows that the Plaintiff had one hour out of the cell per day, which he felt was inadequate time to shower and use the kiosk and phone. Although the Plaintiff was initially placed in THC because of medical concerns, his time there was extended due to multiple disciplinary infractions. The undisputed forecast of evidence further shows that he received due process for these infractions, although he refused to participate in the December 14, 2020 disciplinary hearing. The Plaintiff has failed to forecast evidence that any Defendant imposed a condition that was excessive or arbitrary such that it rose to the level of a prohibited punishment. No jury could reasonably view the Plaintiff's placement in the THC as so disproportionate, gratuitous, or arbitrary that it violated due process. Accordingly, the Defendants' Motion for Summary Judgment is granted on the Plaintiff's claims that the Defendants violated his rights with regard to the conditions of his confinement.

### E. Retaliation

An inmate has a clearly established First Amendment right to be free from retaliation for filing lawsuits. <u>See</u> <u>Booker v. S.C. Dep't of Corrs.</u>, 855

---

[20] The Plaintiff did not allege, and there is no forecast of evidence, that the Plaintiff was denied access to the courts.

F.3d 533, 540 (4th Cir. 2017); Thompson v. Commonwealth of Va., 878 F.3d 89, 110 (4th Cir. 2017).  Inmates also have a protected First Amendment right to complain to prison officials about prison conditions and improper treatment by prison employees that affect them.  See Patton v. Kimble, 717 Fed. App'x 271, 272 (4th Cir. 2018).

To prevail on a colorable First Amendment retaliation claim, a plaintiff must prove that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct.  Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (quotation marks and citation omitted).  Retaliation claims brought by prisoners, however, are treated with skepticism because every act of discipline by a prison official is retaliatory in that it responds directly to prisoner misconduct.  See Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

The forecast of evidence demonstrates that the Plaintiff did not file a grievance against Grooms before the December 11th incident when Grooms allegedly retaliated against him, that Grooms never discussed the Plaintiff with anyone including Rogers, and that neither Rogers, Grooms, nor any other of Rogers' subordinates, retaliated against the Plaintiff for any reason. The Plaintiff has not forecast any evidence of causation between any

protected activity and an adverse action by Grooms or Rogers. Accordingly, the Defendants' Motion for Summary Judgment will be granted on the Plaintiff's retaliation claims.

### F. North Carolina Assault and Battery

When the Complaint passed initial review, the Court exercised supplemental jurisdiction over the Plaintiff's North Carolina assault and battery claims against Defendants Martin, Hodgson, Grooms, Purser, and Kiker. [See Doc. 20 at 19-20].

Under North Carolina law, "[t]he public immunity doctrine protects public officials[21] from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003). "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." Hunter v. Transylvania Cty. Dep't of Soc. Servs., 207 N.C. App. 735, 737, 701 S.E.2d 344, 346 (2010). A public official acts "with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v.Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888,

---

[21] Under North Carolina law, jailers and assistant jailers are entitled to claim public official immunity. See Baker v. Smith, 224 N.C. App. 423, 428-30, 737 S.E.2d 144, 148-49 (2012).

890 (1984); see also Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Grad, 312 N.C. at 313, 321 S.E.2d at 890-91.

The Plaintiff has not forecast any evidence that the Defendants acted maliciously, corruptly, or outside the scope of their official authority, and his § 1983 claims of excessive force and sexual contact were dismissed. The Plaintiff's claims of North Carolina assault and battery fail for the same reasons. The Defendants' Motion for Summary Judgment is, therefore, granted as to the Plaintiff's North Carolina assault and battery claims.

## G. Motion to Stay

On August 22, 2024, the Plaintiff filed an "Emergency Notice" in which states that he is being transferred to Central Prison for emergency healthcare, and that he is projected to be released from NCDAC on September 28, 2024.[22] [Doc. 95]. He asks the Court to stay this case until October 28, 2024 because of the transfer, during which his property is going to be packed and "withheld."

---

[22] The Plaintiff is reminded to file requests to the Court via "Motions." [See Doc. 4].

The Plaintiff initiated this case in March 2022 and the Court previously granted a stay for the Plaintiff to receive, and recover from, surgery. [See Doc. 47]. After balancing the relevant factors, the Court concludes that a further stay of this case is not warranted at this time. The Defendants' Motion for Summary Judgment is ripe, and the Plaintiff has failed to justify a stay of this matter by clear and convincing evidence. Nor is a further stay in the interest of judicial economy. Accordingly, the Plaintiff's request to stay this case is denied.

## V.  CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment is granted, and this action is dismissed with prejudice. The Plaintiff's request to stay this case is denied.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 64] is **GRANTED**, and this action is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff's "Emergency Notice" [Doc. 95] is construed as a Motion to Stay and is **DENIED**.

The Clerk is respectfully instructed to update the record as follows: note that the Plaintiff is also known as (a/k/a) Nafis A. Malik; replace "FNU Grooms" with Ashley Grooms, formerly known as (f/k/a) Ashley Fultz; replace "FNU Hodgens" with Tim Hodgson; replace "FNU Kiker" with Cody Kiker; replace "Pam LNU" with Pam Hypes; replace "K. Martin" with Kelly Martin; replace "FNU Philmore" with Jonathan Philemon; replace "FNU Pursor" with Bradley Purser; replace "D. Rogers" with Dan Rogers; replace "FNU Rucker" with Dana Rucker; and replace "FNU Speer" with F. Speer.

**IT IS SO ORDERED.**

Signed: September 12, 2024

Martin Reidinger
Chief United States District Judge